ll try to save five minutes for rebuttal. The half-a-billion-dollar jury verdict here was a product of an extraordinary effort to inflame the jury with irrelevant and highly prejudicial references to everything from a DPA involving different J&J subsidiaries operating abroad to a resignation email from an employee who complained about mistreatment based on race, and so on and so forth. The district court abandoned its critical gatekeeping function and allowed all of this evidence in, and then allowed plaintiff s counsel to reinforce all of it in the closing argument. Mr. Clement, as arguably improper as each add them up and say, well, this was reversible error, as opposed to, this was a nine-week trial, there were, you know, x-thousand pages of testimony, it s not, it s harmless. Well, Your Honor, it s a fair question, but I think when you add them all up in a case like this and you get a really large number, and then in terms of the number of different errors, I think, that were clearly material that should not have, the jury should not have heard, if you combine that with all of those errors being reinforced in closing argument, and then you look at the resulting jury verdict, which, putting aside some of the legal defects in this case that I m happy to talk about, I mean, this was a half-a-billion-dollar jury verdict that included $141 million in non-economic damages. So I think it s really hard to look at what happened in this case and say that it didn t prejudice the defendant s rights. And I think maybe, you know, if you had these same errors and it produced a $2 million jury verdict, I think I d still be up here saying that that s reversible error, but I think it would be a harder argument, because here I think you can just look at the jury verdict here, and I think the numbers that this presentation produced, I think, speak for themselves, that this was a jury that was inflamed. Its prejudices were inflamed. And I don t think you have to look too far to understand where that came from. I mean, again, this is not like we ve pointed out a couple of isolated evidentiary errors in the record, and then there s a closing argument that focused on just the facts. I mean, this is a situation where essentially everything we talked about, from the DPAs to the cancer evidence to the suicide evidence to the racial discrimination evidence to the doubt is there product book that has nothing to do with implants or anything else relevant, all of that surfaces in the closing arguments as some of the major themes of the closing argument. So we think under those circumstances, there is reversible error. You one of your alternative prayers, of course, is to have a new trial, but given all of the errors that you allege, if those are true, and given all of everything else that s happened in this and other related NBL proceedings, I noticed that unless I missed it, you re not making a request that this would be retried to a different district judge. So I assume that you re not suggesting that the errors are serious enough that we should consider that alternative, which is rarely granted. I understand that, Judge Smith. I think it would be perfectly appropriate for this Court to consider that relief sua sponte, if you will. I ve seen enough cases in various circuits where courts have done that sua sponte that my usual advice to clients is don t ask for that because if the Court is inclined to give that kind of relief, they can give it without you having to ask for it. I m not we do it rarely enough anyway, as I ve already said, but I m not aware that we ve ever done it where it wasn t requested. Yeah. Well, I ll double-check. I m not sure I have a Fifth Circuit case in mind. I know other circuits have reassigned without being specifically requested. Certainly, there The first point of yours, you agree with the following landscape. We re reviewing evidentiary decisions for abuse of discretion. They would be subject to a harmlessness scenario, and we could affirm any evidentiary ruling on any ground. Is that fair to say? I think that s fair to say, Your Honor. I mean, I think I would only add the caveat that I think some of the evidentiary errors are clearly errors of law, and I think that any time it s the old circular maneuver, well, you review for abuse of discretion, but an error of law is an abuse of discretion. Starting with the DPA, especially the Foreign Corrupt Practices Act, you filed a motion in Lemonette to exclude it. I didn t see much of a resolution. Then, it comes up in opening argument. You make an objection, and the district court says, Open the door. Then, it principally comes in through EGIN. No, ECDL first. District court says, Open door again. Then, the spectacle witness you call EGIN. At that point, the district court is now saying it s justifiable 404B evidence, motive, knowledge, course of conduct. For you to prevail, you ve got to show it s the open door theory doesn t work, and 404B isn t implicated. Fair to say? I ll let you go from there. Sure, Your Honor, but I don t understand how we opened the door in the plaintiff s opening statement, which is where they referred to the DPA for the first time. I mean, we haven t spoken yet, so how did we open that door? So, it does seem to me right there, you have an error. And then, I also firmly believe, Your Honor, that opening the door doesn t suspend the Federal rules of evidence. It might potentially make something that was otherwise irrelevant relevant, but it doesn t suspend the operation of 403. It doesn t suspend the operation of 408, under which, I think, independently, the DPA should not come in. I think what he says is, in opening, you said the people of Dupuy are good people. They go do work. They do build projects. So, then he keeps saying, you tell the good story, you ve got to take the bad story. Well, that s why, Your Honor, I said the DPA is referenced in the plaintiff s opening statement. The 2011 DPA. That s right. No, the 2007, the U.S.-based one. There s no reference by, right? I think that s right. But, and maybe that gets to the next point, which is, I mean, let s focus on, I mean, the whole reason that the DPA, with respect to the Foreign Corrupt Practices Act, comes in is only because J&J is in the case. And so, I started with the new trial arguments because, principally, I think that explains the enormous jury verdict here. But when you start talking about legal errors, one of the legal errors that are related to some of the extraneous material that came in is the fact that J&J is here at all as a defendant. Right. But I m going to ask you to stick with the evidentiary point first, for a second. What s your base case saying that you didn t open the door by saying, These are really good people? And they want to turn around and say, No, they bribe people. I don t know that we have a case directly on point for that, Your Honor. I think that the way we ve briefed this case, which I think is correct, is that even if we open the door, that doesn t get past 403. That doesn t eliminate 403. You were official to mention Saddam Hussein. That s just out of sort of out of sight. Is that your point? Completely out of sight, especially when you remember, and that s why I did want to get to the J&J difference, because as to Saddam Hussein and the government in Iraq, I mean, even in the FCPA, DPA, you have other J&J subsidiaries that are neither the you could have kept J&J out of this case and kept it focused on DePue, there would have been even less reason to talk about Iraq, and even if you were going to talk about Iraq, you don t have to talk about Saddam Hussein and the henchmen. So I think with respect to that incident in particular, I think, you know, I would essentially, you know, ask you to focus on the 403 question there, which is opening the door about sort of, you know, being good folks in the Midwest making products that try to help people, whether that opens the door so wide that under 403 you think it s permissible to introduce the DPA, which I don t even think you should introduce the DPA, but then the multiple, multiple references to Saddam Hussein seem to me completely beyond the pale. And I m happy to go down sort of other aspects of the evidentiary rulings, but I did want to comment for a moment on the J&J issue, because I do think that, you know, this is, to me, a very clear instance where you essentially don t have evidence of minimum contacts as to the parent. This is not a situation where the parent has done something unusual, as in, say, the Little case in Texas, where the parent essentially makes specific representations that the parent is going to be responsible for safety in the land. I mean, in a situation like that, sure, it makes sense to both have a voluntary undertaking for state law, and it also makes sense to say, well, if the parent is going to do that sort of thing to purposely avail themselves of the forum, we have minimum contacts. But we don t have anything like that here. They say you own Dupuy, you get all the profits, you advertise to sell everywhere, the jury found that you were a seller, and then your logo is on the boxes that are in Texas. So if I can I take those in turn? But why how isn t that enough under our Ainsworth opinion? It s not enough for the following reasons. First of all, the fact that they re the parent and they get all the profits, that just describes a parent-subsidiary relationship. And so unless you re going to turn your back on all sorts of circuit precedent that says you don t get the parent just because the subsidiary has minimum contacts, those factors I don t think anything can turn on those factors. Now, so the other factors are there s the idea that there was a jury finding that you re a seller. But that at most I mean that s under jury question three and it has to do with this non-manufacturing seller affirmative defense in our view, so it s pretty messed up from a number of standpoints. But even if I mean Texas can have any definition they want of seller under state law, but for purposes of the Federal question, which is are we a seller for purposes of the stream of commerce, I don t think there s anything in this record that supports, including the jury s finding about a state law claim, there s nothing in this record that supports the idea that Johnson & Johnson was the seller of this product. I mean the seller of this product But they rely on the boxes that are in Texas. Right. Okay. So let me take that last piece, which is the logo. So first of all, there s no testimony here that any of the doctors relied on the logo, saw the logo That s a causation question, isn t it? Well, I don t think so because I think ultimately their burden is to show first minimum contacts and then that the causes of action arose out of those minimum contacts. So if the exterior of the boxes are irrelevant because nobody even saw them, I don t think that gives you minimum contacts in a case where you re claiming design defect and failure to warn. I mean, and nobody has an argument that says I mean, you know, if J&J had a division that says at the corporate headquarters that says this is our IFU division, we do all the IFUs for all our subsidiaries. I mean, you know, that s a case where you could go after the parent. But this is nobody has a theory that the IFU is anybody s but DePue s. Nobody has a theory other than a few extraneous references that J&J oversaw the merger of two subsidiaries and therefore it s somehow responsible for all the design decisions. I mean, J&J, the parent, did not design this product. And so you re looking for some connection. And with all due respect, I mean, you know, the idea that J&J appears in the box, I mean, that s a truthful representation about the subsidiary parent relationship. I can t imagine that s enough to get you minimum contacts. How would you use that Ainsworth decision? Do you remember it? Moffitt and the manufacturer I m not sure I have it firmly in mind, Your Honor. But, you know, I don t think there s a case that allows jurisdiction over the parent under circumstances like this. So I assume just of course there are a lot of issues and I have no idea how we re going to decide all of them. But I assume that we were to agree with you on the question of personal jurisdiction for J&J, but we agreed with none of the other issues that you ve raised, Your Honor. So, you know, what would happen to these proceedings if that were the result? I think if that were the result, then I do think that, you know, the verdict against DePue would probably stand. I still think it would be an important decision for this Court to make because I think it would have consequences for the other cases in the MDL, which is even though, I mean, you know, to be perfectly candid, Your Honor, if you look at J&J s role in this case, in this case in isolation, in light of the verdict, and you assume for a second that the exemplary damages cap in Texas law is not unconstitutional, as my friends argue in the cross-appeal, if you assume all that, then J&J as a dollar figure being in this case doesn t make a big difference. But not having J&J in these cases because they don t belong there does make a big difference and allow me to mend my argument just one little piece in terms of the effect in the other case because when you say I have to assume you ve ruled against me on every other thing, it s a little hard to know exactly what that means. But, I mean, you know, I do think if J&J s out of the case, the errors that we ve identified in terms of particularly the DPA involving Iraq, I mean, become that much more indefensible because if there was a thin veneer of a link between DePue and the conduct in Iraq, I mean, it was going through the parent. It was not I mean, there s no other way to sort of get there. So I do think but I m willing to assume that if you rule against me even on that, the real impact of J&J is less on the verdict here than it is on subsequent cases going forward where I think it will make a big difference. The question was not designed to indicate that we might do that but only to isolate that one issue and to examine its effect on the rest of the case. No, I appreciate that, Your Honor. Now, I think in turning to some of the other issues that are of, you know, central importance I think in the case on the whole, as to the design defect claim, I think as we have argued, we think that the design defect theory here that the plaintiffs have put all their essentially all their eggs in the basket is a categorical defect theory that we do not think the Texas law allows. We think to essentially say that a metal-on-metal hip implant is defective because it s made of metal is a lot like saying that a convertible front-end loader is defective because it s a convertible and doesn t have a permanent rollover device. We think it s a lot like saying that the pharmaceutical at issue in the Brocker case is defective because it combines estrogen and prestogen probably not saying that right. I mean, these are Texas laws that said the way that we re supposed to think distinguishing alternative and distinct is different customer, different problem, different solution. I think you can certainly divine those principles from the Texas cases. You know, I m not sure they laid out quite as cleanly as that, but to me it is the same orbit of people and they re trying to get at longevity when they came up with the metal-on-metal, but we know from the revision rate it actually wasn t longer. Well, yeah, a couple of problems I think with that way of looking at it, Your Honor. I think, I mean, I think you need to look at it at a less high level of generality than that, and I think Brockert tells you that for sure. Because Brockert s about two competing hormone replacement theories, and one of which is just estrogen and one of which combines estrogen with another substance. And so we know you have to, from that. We think this situation is essentially in all four, on all fours with that dynamic because the dynamic is exactly the same, which is you have people who are trying to find essentially a solution to the problem with the pre-existing product, pre-existing product. I thought it was twofold. They don t last long enough and they have the osteo, how do you finish the word? Osteolosis, I think. Osteolosis. But then I thought the record shows that in fact now we know the metal-on-metal lasts less long and it also has osteo. Well, two points, Your Honor. One is I don t think you get the benefit of hindsight and say the thing, you know, didn t work out the way we thought it would. I mean, I think that the relevant time for thinking about it is that the time that the doctors are making the decision, the time that the device is being implanted. Okay, that would be significant. Do you have a case that states that? It s intuitive, but that would I m not sure that issue figured as prominently in the cases that I ve seen. I think I don t think there s anything inconsistent with that in those cases. And I think, you know, if you look at the Brockert case, you know, the science was moving on there about the combination drug and I don t think anything really turned on that there. Is it your argument that these aren t just alternatives if we now know the plaintiffs all themselves got the other one? No. No, that doesn t. I mean, I don t think that helps either side because, I mean, that could easily support the idea, yeah, they re different products. The first product didn t work, so they went to the second product. Or I could say, well, they re sort of loose substitutes. But, I mean, you could have had the same thing in Brockert. I mean, if for some reason one patient couldn t tolerate one hormone replacement theory, presumably they would go to the other one. So I don t think that shows you anything. Here s what I think makes them parallel. So in Brockert, you had the preexisting treatment and it had a problem which was, and I m probably mispronouncing this, but endometriosis or endometriosis cancer. And so the new product addressed that kind of cancer, but it did create an increased risk for breast cancer. Now, the idea there was, well, and the plaintiff there did get breast cancer. So the argument was, well, this is defective because you just gave us an increased risk of breast cancer. And what the Texas Court of Appeals says is, no, you can t do that because you just, you know, you had two competing products that were trying to solve slightly different problems, and you re just basically saying they should have stuck with the old product. And here it s the same thing, and this, you know, I don t think it s fair to say that the metal-on-metal causes osteolysis. I think it causes a different problem, which is what makes it more parallel. I mean, you know, it doesn t cause osteolysis, it causes metalosis. And that s, you know, mostly because it s metal and not plastic, but part of it is I do think the disease operates in a little different way in terms of its effect on the bone structure and the like. And so I think this is very much parallel to what was going on in that case. I also think you have something here that s very helpful in saying that these are different products, not just alternative designs, and that is the fact that the federal government through the FDA treats them as very different products. One s a class 2 device, one s a class 3 device. Now, I m not saying that s outcome determinative because it s ultimately a Texas law question, but I think that s very helpful in reinforcing the intuition. Male Speaker 2 Metal-on-metal, even today, is class 2? I thought they elevated it to PMA class 2. Dr. Eric Green No, no. Well, I think it s still class 3. It now requires a PMA. But the classes, you know, I mean, you know, as a technical matter, they are still treated differently. They ve always been different classes. The difference in treatment is at the time of the primary conduct here, the metal-on-metal putting aside resurfacing, which is, you know, which we think is actually still counts because we think the distinguishing feature of the product is the metal lining. But in all events, putting aside the resurfacing, if you want to get a new metal-on-metal on the market now, you need to go through the PMA, where at the time you needed to go through the 510K process. Male Speaker 2 Is metal-on-metal being marketed now? Dr. Eric Green The only metal-on-metal product that s on the market right now are these resurfacing devices, which are different in from the FDA regulatory perspective, but we think they still have the critical feature that my friends on the other side said was the defect, which is they still have metal in the line. Male Speaker 3 On your claim for a new trial based on the three different theories, non-manufacturing seller, aiding and abetting, negligent undertaking, assuming we found any one of those incorrect and that entitled J&J to some relief, it seemed to me you were also saying that Dupuy, I'm not sure, how do you pronounce Dupuy? Dr. Eric Green I'm not sure anybody's got a monopoly on that, Your Honor. Male Speaker 3 Tell me what you want to hear. Dr. Eric Green I've been saying Dupuy, but I've heard my co-counsel say something different. Male Speaker 3 Okay, Dupuy. You seem to be saying that Dupuy also gets some sort of benefit from that. Now, if we found that one of these or all of them were improper, and obviously it would give some relief to J&J, does it also give any relief to Dupuy? Dr. Eric Green Well, it could, Your Honor, on sort of two different wavelengths. One is if you think that J&J's involvement in the case was critical to getting some of the evidence in front of the jury that shouldn't have, that might have some impact. The other way, though, I think it would have the impact is I do think technically it would mean that you'd have to do the punitive damages over. Because the jury kind of did a unitary punitive damages award, and if they shouldn't have been hearing any misconduct involving J&J, I think you would have to do that over. I don't think that in and of itself would necessarily take out the compensatory award against Dupuy. But we do think that the compensatory award to Dupuy falls for about four independent reasons, including the evidentiary errors, including the design defect issue that I've already talked about. And we also think there are evidentiary problems with the failure to warn theory. We think there are legal problems as well. But on the failure to warn, we think both that the warnings that were included in the IFU were sufficient as a matter of law, but we also think that in a more case-specific way that the evidence here just doesn't show that the failure to warn was the producing cause of these injuries. I mean, with respect to two of the actually treating doctors who would be the people who would be in a position to know whether different warnings would have made a difference, two of them didn't even testify as to two patients. One of the doctors specifically testified that it wouldn't make any difference. And with the other two, all you have is testimony that suggests that these products were supposed to last a lifetime, which I don't think is responsive. I want to say I look at CentiCorps and our, what is it, Thomas v. Hoffman, to suggest that it isn't a subjective inquiry. It's did Dr. Morey say, hey, a reasonable doctor with the right warning wouldn't have done it? I don't think that's the proper way to interpret Texas law, Your Honor. As we point out in our reply brief, there's a post-CentiCorps Texas case that specifically rejects the idea that there's an objective test. I think at the end of the day, I don't know how it could be entirely objective because at the end of the day, it's a causation question. I mean, it's not — You're saying the jury couldn't even get this issue, right? We're saying — And they apparently believed that they were. We think on this record, you know, we should have gotten a Rule 50 motion at the close of their case because they didn't have the evidence. Why wouldn't Dr. Morey Sr.'s remarks about no, you know, any doctor should have run, you know, the warnings were out there, but they weren't on the IFU? Yeah, I think that was Dr. Matthew Morey, so I think that's Dr. Morey Jr., but nothing turns on that. I don't think that's enough. I mean, I think, you know, I think we argue two things. One, we say that, you know, you actually need some expert evidence and that's all they have and that's not enough because it doesn't focus on the IFU. So that's one argument. But we also argue, even if they had better expert testimony, they still got to tie it up and show that it's a producing cause in this case. And the Ackerman case from the Fifth Circuit, and I'm going to butcher the name, but the Podjestileski case from the circuit, you know, those two cases both find that you have cases where the doctors in the two cases essentially, one testified expressly, one there was an absence of evidence, but in both cases the bottom line was the treating physician said the warnings changed when it made any difference. And that's what you need to do to put a failure to warn case on under Texas law, consistent with the learned intermediary doctrine. So in these failure to warn cases, it's a little difficult to zero in on the IFU because doctors are very confident people and they may well say, that's not going to change my behavior, I'm not sure that resolves it, but that's just an interesting sort of mind bender for me. What about their response that, well, here your client pled back to the DPA that they had consulting agreements to induce doctors to use it. And once you've got that in the picture, it isn't what would have influenced the doctor. You have this, you have affirmative, you have your client as the affirmative duty to warn the patient because the doctor is sort of in the pocket. Does that, do you understand that? Yeah. I think there's two questions embedded in that, and I know I'm over my time, but with the Court's indulgence, if I can answer both pieces of it. One is, I think it is true that the IFU is not the end-all and be-all for a failure to warn case, but I do think that it's the burden of the plaintiffs to show that the IFU did not warn about the conditions they're complaining about. And I think Ackerman stands for that proposition. And that's why I think it's fatal that, you know, they can say, well, they should have done other things, but they don't have any testimony that says that the IFU was inadequate, because the only expert they have is Matthew Morey, and Matthew Morey says, is asked about warnings from a different study and says those would have, you should have given those, but he's never asked about the IFU, and I think that's a critical gap. So that's the first part of the question. The second part of the question is, I don't think, even though there might be an argument to be made that because of the consulting arrangements, there's somehow an exception to the learned intermediary doctrine, as we point out in the reply brief, the district court found that the learned intermediary doctrine applied here, and there's no cross-appeal on this issue. So I think it's too late to try to argue for an exception to the learned intermediary doctrine, you know, and we would have answers to why these consulting agreements aren't the kind of consulting agreements that are actually sufficient and all of that, but we didn't need to make those arguments because they didn't cross-appeal on that issue. Thank you very much. Roberts. Thank you, Mr. Clement. We save time for rebuttal. Mr. Starr. Starr. Thank you, and may it please the Court, let me begin with the evidentiary points, which Mr. Lanier will also be talking to. And let me urge the Court to be very transcript-heavy here. My brother on the other side has done a masterful job of cherry-picking. If you look at the transcript, it was a 31-day trial. I have reviewed the transcript, 38 volumes of trial testimony. As great lawyers do, they're great lawyers on the other side, they have cherry-picked here, there, and virtually everywhere. So let me address some of the specifics, but I want to move quickly, if I may, to J&J and the design defect. With respect to the opening of the door, Judge Kincaid had presided on MDL, Bellwether Trial No. 1. In Bellwether Trial No. 1, this kind of evidence was entirely kept out, and then once the plaintiffs had called all their witnesses, then we heard Johnson & Johnson and DePue, this is your life. Now, these are effective trial lawyers on the other side. But this is why, when you go to page 2 of our brief and we quote, Judge Kincaid saying, you cannot say Johnson & Johnson, this is your life, DePue, this is your life, and not have the other evidence come in. This is absolutely the way the adversary system works. It's called impeachment. And it was fair and just impeachment. The evidence that we hear from Mr. Clement — But was it still subject to Rule 403 balancing? I believe that it is. It is subject to balancing. But what we want this Court to understand is, at the beginning, an evidentiary reference that he is relying on was literally one line in the opening statement which grew out of these consulting arrangements, which he suggests are completely innocent, but they're not completely innocent. And it was fair to flag the fact, in the context of consulting surgeons or design surgeons, some of whom were paid many millions of dollars. The jury deserved to hear that, because this is the way this product was marketed. But you're right. We have to focus on the transcript. It would be true. Cross of their doctors would be fine to say, do you have a consulting agreement. But really what's very important for me is the FDCPA and bribing government officials in Iraq. It just is extraordinarily distant. And you're saying it's impeachment. But so specifically of what witness, who was being impeached on that theory? That was the entire approach of J&J that included DePue products being marketed. These are DePue products being sold in Greece and other countries and in violation of the FCPA. And they agreed that we, in fact, did wrong. But isn't that classic propensity evidence? I think it's classic impeachment when they have opened the door. Now it is very important for I'll just interrupt. And I don't mean to. I see open the door as very different than impeachment. I'd really, if we could, instead of using those expressions, let's talk about rules of evidence. The district judge here had a motion to exclude the DPAs. I don't see any ruling on that pretrial. Then they do make, in one page of opening, they say the people of DePue are good people. I think that's the phrase that you would then say, open the door. Not to the entirety. No, I agree with that. Not to the entirety of bad acts. These are contextual determinations made under an abusive discretion standard as he sees the trial unfold. But if you could just give me a specific quote where the defendants brought up how good they were, that makes the rebuttal or curative for open the door seem. Yes. What's their worst piece of evidence that opened the door? Their, I believe, worst piece of evidence is how their marketing practices were entirely ethical and proper around the world. That this is a good — What witness said that? I beg your pardon? What witness said — If I may, may I defer to Mr. Lanier, who tried the case on that particular one. But if the Court will, and I'll give the Court one more example, mindful of my time, I would guide the Court to transcript volume 30. Many of the complaints that you hear from the podium relate to the cross examination of Dr. Ernest Boyer. Dr. Ernest Boyer was brought out to show there's really no harm in these levels of metal, of chrome and the like. He relied on very, very weak, in fact, inappropriate studies. And so issues such as Erin Brockovich and the like all came out during the course of cross examination in impeaching this particular witness who had, in fact, not done his homework. He was relying on very questionable science. Call it bought science. I would call it junk science. If the Court will simply take the time, and I know the Court is busy, to look at that particular transcript, you will see that a number of things that are being argued arise in the context of cross examination. And, again, that brings us to abuse of discretion. The judge heard all of this. And may I now move to Johnson & Johnson? I want to ask you about the predicate for bringing in this e-mail from the employee as she was leaving Dupuy. Yes. The context there was one of the Dupuy witnesses, Andrew Echdahl, making it very clear that this is a wonderful company. Everyone loves to come to work. We take care of our people and the like. And when you read the entirety of that transcript of the entire cross examination of Andrew Echdahl in Volume II of the trial transcript, you will see that there was a progression of questions that then led to, well, this revelation that this fairly high-ranking employee at Dupuy was, in fact, miserably treated, and it was not offered for the truth of it, but it was offered to impeach the proposition that these are such great companies. This was their overriding and overarching theme, Judge Barksdale. We are Johnson & Johnson Dupuy. We would not do this kind of thing. We love our country and we love our people. It's only fair in an adversarial system for these kinds of issues. And, by the way, it was not hearsay. It was simply said, here we are impeaching Andrew Echdahl, the president of the company, who knew this person, and he, in fact, testifies. Well, she was disgruntled for a number of reasons, even though we put her through Notre Dame and an MBA program. She was a promising employee. But when you look at this transcript in context, I think you will see that we tried the case honorably, with integrity, and Judge Kincaid was exercising his discretion, which is what trial judges have to do, especially in a 31-day trial. In terms of the ---- So how much does it open the door for if a company says we're good guys and we build products to try to help people? These are judgment calls. Well, I mean, hypothetically. Hypothetically. Suppose then would it be okay to come back and say that a Johnson & Johnson plant had violated an environmental regulation or a setback requirement on the local zoning ordinance or any of that kind of thing? How far does it go? Does we're a good guy just mean that anything that would cause a jury to think ill of them is open season? No, Your Honor, it does not. What it means is an issue is before the trial judge, and the trial judge has to make these judgment calls, typically on the spot. And then to say, and Judge Kincaid, if you review 31 days of this transcript, you will see he did sustain objections. But the context of this, believe me, is cherry-picking certain bad things, putting them all in the brief and saying, now look, isn't this terrible? The jury must have been in play. Absolutely wrong. When you read the transcript, you will understand why the jury was very upset with Johnson & Johnson and DePue. They knew that this product, if I may say a word about the product, that the product was dangerous. They knew it at the time. 1995, the in-game memo coming from DePue, England. Catastrophic, the word catastrophic is used twice in that in-game memo. They knew all along, read the testimony of the experts. Albert Burstein, magnificent biomechanical engineer, head of the biomechanical engineering department at Cornell's Hospital for Special Surgery. They are spectacular expert witnesses. Their expert witnesses, by the way, were all bought. They were all bought. You're going to get that in the second appeal. But of the 12 expert witnesses, and this is, I think, a very important contextual point. Mr. Starr, all you're doing is giving us another jury argument. You've already won the jury verdict, so why don't you move to a legal point? I don't understand what legal point you're covering. I'm trying to understand, to put it that the jury had the entire context in. I will move to Johnson & Johnson. Well, before you do on that, just you are saying the admissibility purpose was impeachment. Yes. One of the principal reasons was, in fact, impeaching. And that was of witnesses. But if I may. Those were your witnesses, but you treated them as hostile, and you were impeaching them with prior convictions? So the deferred prosecution agreement is a prior conviction? Is that your point? No, it's not a prior conviction. But it is a relevant act in terms of the marketing. And here, I think, is going to, Judge Smith, your concern, and that is there is a nexus to the marketing practices because we believe this product was driven by marketing. That's the nexus that ties everything together. And so if I may speak to Johnson & Johnson. Johnson & Johnson helped design this product. And they can't dispute it, but the exhibit specifically says this. They helped design the product, and then the product, your honors, could not have been sold, marketed or sold, without their express approval. And that express approval is in the record. That is why the jury found, specifically based on the evidence of a 31-day trial, that Johnson & Johnson had participated in the design. That's a very important finding and conclusion by the jury. And then participated in the marketing, and the evidence is overwhelming of Johnson & Johnson's involvement. In the brief, we identify, due to word limitations, not first names, but the employees and officers of Johnson & Johnson who were directly involved in the activity of this particular design, this particular product, which they were so proud, including the CEO of Johnson & Johnson, Gorski, and then Weldon. This is satisfying what I'm about to describe, I believe satisfies the law of this circuit in terms of personal jurisdiction. But I think it satisfies any test that the Supreme Court, including the conversation that Justice O'Connor began and Asahi and the like. This is Stream of Commerce Plus. We guide the court to the HIP replacement website, on by Johnson & Johnson, not on by DePue. And on that website, there are opportunities to connect, and those opportunities were availed. And, in fact, one of the surgeons in this particular case, Dr. Heinrich of Austin, is one of the individuals to whom that website directs patients. You needed HIP replacement? Go see Dr. Heinrich, who is one of the treating surgeons. We had a commercial bribery claim against Johnson & Johnson, DePue, for that. The jury, by the way, supposedly inflamed, returned a no verdict on that count. That would have been enormously helpful to us, but they listened attentively. And, by the way, they were properly instructed. And I move now to the design defect point. The evidence was overwhelming that this design was defective. You have identified in your questions. The court has some of the issues, some of the evidence. I would guide the court to our citation to the record. Footnote 8080 has an abundance of sites that go to the specific issue of defect. So the evidence was there, so what is their defense? Their defense is, as a matter of law, under the Fifth Circuit, we heard a lot about Brockett v. Wyeth, this is a different product. It's not a different product. Each of these plaintiffs was revised through the revision surgery, replacement surgery. The metal liner, which is the evil that infected this product, the metal liner was taken out and the polyethylene liner was inserted. If you go to page 24 of our brief, you will see that DePue, Johnson & Johnson, is advertising both their marathon, introduced in 1997, that's cross-linked poly. It's what Sir John Charley started back in the 1960s. And now they have an updated version of that called Ultrex, which reduced polyethylene wear significantly. The Court has asked questions, going to the record, that show exactly. Maybe it reduced wear, but does the record show that it also caused less osteolysis? Yes. Osteolysis is dead in the water in light of medical science and polyethylene, and in fact, I shouldn't say it's dead in the water, I've over-argued. What is true is that metal on metal, but we're not talking about metal on metal categorically. We're talking about this product. We're talking about this specific product. We didn't try all of metal on metal. We didn't try resurfacing. Is it true that the Maurice, both doctors, were not shown the IFU when they gave their opinions as to an objective, reasonable doctor would not have used this? I don't know the answer to that. Why isn't that really important? I don't think so, Your Honor, because it was undisputed that the IFU, first of all, it's opened in the operating room, but let's leave that aside, and no surgeon, there was no testimony that any surgeon looks at it at any time. But here's our fundamental point on the warnings. There was no warning in the IFU, the technical monograph, or any other material of the specific conditions that afflicted these plaintiffs. But it did use metal debris, could result. It uses metal ions, but metal debris, but not the key that they'd never used the term or described toxicity. The entire thrust of what Jonathan and Jonathan DePue has done for years is to say, these are metal ions, they can pass through the body. Dr. Kearns testified that, yes, I thought they were going to just be passed through the body. He was deceived. And they call it, we just were not informed of information that Jonathan and Jonathan DePue had. And when information would come to them, this is all in the 31-day trial, when information would come to them, I cite you to the testimony of two doctors. Dr. Tony Norigal from England, who was a consulting surgeon for them, says here at North Tees Hospital in Leeds, we're having terrific results with metal on poly, and we're having an enormous revision rate with respect to metal on metal. You reintroduced it. You have experimented in a way that has caused this phenomenal harm. And you see, osteolysis can be treated. Bone surgery is different. This is irreparable. The tissue damage, and I was enumerating the warnings that were not given. Metallosis, pseudotumor. Look at our expert, Nicholas Athanasou from Oxford. He had the slides. These are the conditions from which these, our plaintiffs, suffered from. Disabilitating kinds of injuries, late in life for them. This is very, very... I was just going to go and say, it is evil stuff because they knew. And do you know what they did in response to... How does the testimony regarding pseudotumors, how does that pass the 403 balancing test? The testimony with respect to what? The pseudotumor testimony. How does that pass the 403 balancing test in terms of prejudice to get the jury concerned about cancer when there was none? Your Honor, these... First of all, these are conditions that the other side now says we were warning about. Once the FDA acted in 2013 with its notice of proposed rulemaking, the other side changed its warnings and warned of pseudotumor with respect to cancer. If the Court reviews the transcript as we're confident will, you will see cancer was talked about by both sides because it was in the literature. The way they tried the case for those 31 days was to review the literature to say these risks were known. That was part of their strategy. And part of the risk was, in fact, cancer. It was introduced by Bernard Mori who said in response to the question, why did you not, as the chair of orthopedic surgery at Mayo Clinic, why did you not use metal-on-metal? And among other reasons, he simply said, because of the cancer risk. It was in the literature. He wasn't making any of this up. Johnson & Johnson, I need to say one thing to come back. I'm on design defect. I need to say Johnson & Johnson marketed this product through their own voices, including the CEO. So even, I believe, Justice O'Connor, were she here and saying, we don't want companies to be hailed into court with such a limited basis and isolated sale. First, you have five plaintiffs from Texas You have advertising, direct-to-consumer advertising, into Texas. And by the way, the — Your time has expired now, unless you want to use some of Mr. Lanier's time. It's up to you. Thank you. I thank the Court for its attention. Mr. Lanier? May it please the Court, what an honor to get to be here. I am rare to these places, and I thank you for the time. I've tried all four of the Bellwether cases personally. I've taken each witness. I've made every argument. And so I'm here to answer specifically some of the argumentation issues that have come before the Court in terms of the evidence. Judge Smith, you asked, how wide does the door open? What a great argument. Does it open to taking out the garbage wrong or whatever it may be? Absolutely not. I think any open door in a trial is a stair-step process. So what we have is a question of how wide the door is open and what's legitimate for a trial counsel to walk through and what's not. In this case, the opening started the door. It started the door. It cracked the door, if we can't say it was already cracked by the behavior from Trial 1, which is not before this Court. But when defense counsel stands up, and on page 2 of his opening, which means it's within 60 seconds of when he started, says men and women of DePue get up in the morning, they go to work every day with one goal in mind, to produce products that help people get better. People of DePue are good people. They're really marvelously people. They've been doing it for 100 years. You don't stay in business for 100 years if you do something wrong or bad. Around the world, the equivalents of the FDA have approved, cleared, permitted the use of metal-on-metal devices, the pinnacle ultimate in 51 cases. They've never said your device is defective. In foreign countries... What witness for them stated what Mr. Starr said you'd tell us, which is that they represented, they sold products ethically around the world? It would be really important for you to tell me that because then I do think it would be contradiction evidence to say, no, they bribe people around the world to buy them. So I really want a record site for we made ethical sales around the world. Volume 3, page 215 and following. Your Honor, the witness was Andrew Ekdahl. Your witness, who you declared hostile. He, no. No? Not really. I called him in case in chief and I put him on as a hostile witness. That's what I just said. But what the judge required is that when I put on a witness, he required that the defense put on their case in chief through those witnesses that they were going to use at the same time. He said we sell products ethically around the world. During the case in chief part. So he would officially have been their witness even though I had called him to the stand because the judge for trial efficiency made them do it. And here's what he said. Your Honor, after showing pictures of Warsaw saying that Depew is small-town America with a picture of the main street, a picture of the seminary, which he didn't even know anyone who had ever been there. I couldn't figure out why he put that on there. Object to that? No, Your Honor. I mean, if he wants to show it, that's his prerogative. And my view is truth is truth and the jury will get to hear the truth. And so I'm not a heavy objector. If that's the way he wants to try the case, my responsibility as a trial lawyer in my mind is just to try the other side of it. And then he takes the Johnson & Johnson credo. It's Johnson & Johnson credo, which they live by. And he puts it on the Elmo for the jury to stare at while the questions are being asked. Why do you stay at Johnson & Johnson for 25 years, Mr. Ekdahl? Why do you become the president when you could do anything else? He said, because of this set of principles on how we operate. Our first responsibility is to the doctors and nurses and patients and mothers and fathers. And question, do you do that? Answer, 100%. We stay at Johnson & Johnson because of this credo. Now, here's what the credo says, which is part and parcel to your answer, Justice, Judge. We're responsible to the communities in which we live and work and to the world community as well. We must be good citizens, support good works and charities, and bear our fair share of taxes. Is that the way he was answering that question, Mr. Leno? Yes, sir, absolutely. What was this in theatrics? Because I feel like I'm going to have to go get some popcorn. Your Honor, I apologize. That's the trial argument, and I'll try and tone it down. I apologize very much because I have great respect and dignity for this court and for you and for each of you. So then you cross him saying, you've just said you're good citizens worldwide. That's not truthful. Here's a deferred prosecution agreement, and you limited it to his truthfulness? Or did you try to offer for the truth of the matter to say, ladies and gentlemen, you've heard they bribe officials around the world. They must be bad people. Well, I stemmed it. I didn't quite do it that way, but I did it in the stair-step process that Judge Smith, I started this colloquy out with in terms of him. I stemmed it off of the line, we must provide competent management and their actions must be just and ethical. Plaintiff's Exhibit 479 is what it was. And so my question to him was, sir, as a matter of fact, what you've got here is a culture of bribery and corrupt practices, to some degree at least. And his answer was, I disagree completely. Culture of bribery and corrupt practices, okay. Yes, Your Honor, because that's what they had. They did those things. So you're using these as convictions to impeach him under 609? No, Your Honor. I'm not using them as convictions to impeach him. What I'm using them as is an admitted culture that existed because Johnson & Johnson signed off on the Deceptive Trade Practices Act, on the DPA, excuse me, on the Foreign Corrupt Practices Act. Johnson & Johnson signed off on it and admitted that they were responsible for those actions. You know, having been a prosecutor, to say, ladies and gentlemen, they're liable because they have an admitted culture of criminality elsewhere in the world, that just seems to me exactly what you can't do. Did you do that or not? No, Your Honor. Okay. Well, then, you know, because I think reading the record of the closing argument, you built to this final step of your stare, ladies and gentlemen of the jury, the company bribes Saddam Hussein's government. And then this is exactly what you said in the next sentence. The DPA has Johnson & Johnson admitting its responsibility. They're admitting they're responsible. They've already taken this issue out of your hands. That alone, the DPA, is a winner. So how can you say they agreed to bribing officials alone means they're liable here? That was a winner, Your Honor, in my argument, under the idea that Johnson & Johnson had responsibility for the actions of the subsidiary. Because that's what Johnson & Johnson says in the agreement. The agreement is admissible on that grounds as well, but for the 403 issue. And I don't think the door was open. But on the issue, because time's running out, just give me your best case that allows you to use evidence in closing to say they've agreed, they're guilty of bribing officials elsewhere, and that's where they're admitting responsibility to this complaint. What's your best case? My best case is that's why Johnson & Johnson is admitting that— A case citation for opening door, 609 impeachment, 404B, any rule of evidence that would allow you to do that. Just give me a case. Your Honor, in the grand scheme of things, I know no case on those points. What I would urge the Court to consider is, is in the next trial they didn't open the doors and I didn't get into any of that stuff. And we got a billion-dollar verdict. Right. In other words, that's not the argument. What you're couching is not the argument I was trying to make, and I don't believe it's the argument I made. I think I was making that argument in reference to the fact that Johnson & Johnson had admitted responsibility for the acts of its subsidiaries, and so they couldn't try and skate Johnson & Johnson and say Johnson & Johnson didn't aid in a bet, didn't do any of these types of things, because we had a winner there. It is that foreign corrupt practices. You have a product defect case, failure to warrant case, and all of a sudden in closing it's become, did they bribe officials in Iraq? It just, to me, even if there's open door, you can rebut something they said about being good. It doesn't mean you can go explosive and inflammatory and say, we've already got it all here. Look, they signed. They bribed people. What we had there was an admission by Johnson & Johnson that Johnson & Johnson was accountable for the Pew executives who bribed. And so the thrust of my winner there was on the issue. I'm going through the charge, and the question includes, is Johnson & Johnson accountable? Does the parent company have responsibility? I really would like a case. It may be in the brief. Okay. In these cases what will happen is, you know, that was an isolated comment. We made a mistake. But it's harmless. But I don't see anyone saying, geez, in hindsight, we definitely shouldn't have said Saddam Hussein bribing those people. Well, Your Honor, clearly I did not do that in the next two cases. I don't think the door was even remotely open. Actually, I argued it was, but the judge said it was not. That's a little bit outside the record. Yes, it is, Judge. Before my time is up, what I would like to do is correct a couple of things that have been said by my learned opposition. The IFUs. Your Honor, you've had a lot of questions, and you have less than a minute left, so I'm going to give you two additional minutes. Thank you, Judge. And then Mr. Clement will have two additional minutes on his rebuttal. Thank you very much, Judge. I appreciate that. One of the things that I'd like to address is the IFU. An IFU comes in the package, and no surgeon reads it or touches it or gets it. And the testimony is clear, the record is read carefully, that it is generally the sales rep who's in the surgical room who opens the box and throws the IFU away because the surgeon's in the sterile field, and then the part is given up to the surgeon to then open that insert. So no surgeon reads the IFU in terms of warning. Next point on the IFU that wasn't clear. The IFU, there's one for the cup, and you use the same cup with everything, and regardless of the liner, poly, plastic, ceramic, doesn't matter, metal. But there's a special IFU for the metal liner. That one doesn't have any of the warnings. Not the porous exterior of the liner. Exactly. And that one does not have the warnings. And so within the framework of that, there's some suggestion that the warnings were in the IFU. They're not in the IFU, even if a surgeon got it, but all of the testimony, including from their own surgeons, is, I don't read it, wouldn't read it, and wouldn't go to a surgeon if a surgeon wanted to read it. That's important because the learned intermediary defense in Texas under center court, explained by the Siegfried case as well, is that the manufacturer has a duty to get the warning to the patient, but the manufacturer is deemed to have done that if the manufacturer gets it to the learned intermediary. In this situation, the manufacturer never did. So for causation, we don't simply have to ask the doctor, would you have done it but? We can also ask the patient, would you have allowed it to be put in you? And that's standard course and fair in these cases. That was a jury finding. Correct, Your Honor. But they object and say that, as Mr. Clement said, we don't have a doctor saying it would have made a difference in our prescribing habits. That's not the test under center court and under Siegfried. Under design defect, I would urge the Court to consider the fact that this is a novel argument, that we are not the convertible as opposed to a hard shell on a car. We fit squarely under illustration number eight, restatement of torts third, product liability section two, where the illustration is given, if you invented a new antenna that was going to wire all the way through the house and it turned out to burn down the house instead of the other, I've lost my time. But that comment is worth looking at. Thank you, Judge, for the additional time. All right. Thank you, Mr. Lanier. Mr. Clement, you've saved time for rebuttal. You have seven minutes. Thank you, Your Honor. I appreciate it. I'd like to make a couple of points in rebuttal. First, I want to start with the evidentiary questions. Now, Mr. Starr, my friend, was very clear, I think, when he said that even if you assumed that DePue opened the door, which they didn't, and I want to get to that, but he was very careful in his words because he talked about DePue being engaged in some conduct in Greece. But because he was careful, he didn't say anything about DePue in Iraq because DePue didn't do anything in Iraq. That was a different J&J subsidiary who is not even sued as a defendant in this case. But if we decide J&J is a defendant, it would be rel—maybe you could have asked for a limiting instruction, but it would come in against J&J, right? I certainly don't think so, and they're not saying that at least—you know, they say different things at different places, but if they're talking about DePue opening the door, which was Mr. Starr's point, that doesn't get you to the other J&J subsidiary. I don't think just because you get J&J parent in, that means you get every other J&J subsidiary in. So I don't even think getting J&J parent in is sufficient to get to Iraq. I think to get to Iraq, you'd have to sue— Who was the former CEO of— I think he was moving from DePue, and at the point he was testifying, I think he was at J&J. But again— But that's where they say the door was open, that he said, we're good citizens around the world, and they're saying therefore— Well, please—and let me get to that, because please look at—I mean, the citation I heard him give you is Volume 3, 215. So we pulled it up, and it's talking about what a nice town Warsaw, Indiana is. Now, maybe I misheard it. If your witnesses, and I know they're hostile witnesses, said, we are great citizens around the world, then I could see impeachment as to, no, you bribe people around the world. I still don't see affirmative use for the truth of the matter, and they haven't argued 404B, so I'm still sort of confused. But what do you think about that model? It may get them that far, but it doesn't get them to using the evidence the way they used it. And with all due respect, it doesn't—you know, if you look at the transcript, it's really interesting, because they talk about what DePue did with the government of Greece, and they talk about what other J&J subsidiaries did with the government of Poland. It's only when they get to Iraq that you don't hear the country mentioned, and it just becomes Saddam Hussein, Saddam Hussein, Saddam Hussein. And that just shows you that what's — I mean, you know, if I take a step back, and I think of two things that really ought to be out of bounds unless the case is about them, I would think the two things that ought to be out of bounds unless they're directly material to the case in chief is Saddam Hussein and racial discrimination. And we got them both here. This case had nothing to do with Saddam Hussein, but Saddam Hussein pops up in the closing argument, as Your Honor pointed out. This case has got nothing to do with race. And what are we supposed to do with a resignation letter? I mean, my friend on the other side, it's not hearsay. I can't for the life of me understand why a resignation letter is not hearsay. And since they're trying to rebut or impeach our corporate culture, I don't know how they're admitting it for something other than the truth of the matter asserted. But even putting all that aside, what were we to do when some employee who's not appearing as a witness in the case in a letter says that she had a racially discriminatory experience? Are we supposed to stop defending the products case and put on a defense of a racial discrimination case? I mean, that's the position it puts a company in. And if I could just say two other things, Mr. Starck, on the evidentiary issues. Mr. Starck? Your client just hires and bribes and induces doctors, and you get the point. So our theory, the evidence we offered is intrinsic to the offense. With respect, nothing about a design defect and failure to warn case in Texas has anything to do with Saddam Hussein or this individual's racial discrimination complaint. Nothing. Zero. Now, Mr. Starck, presumably because it thinks it's better than some of the other evidentiary errors, wants you to look at the transcript of Mr. Bout, the expert buyer, and the doubt is their product and the way that was used, I would invite you to use that, because I just don't know how in the world you get to read page after page of an inflammatory book that's all hearsay and has nothing to do with this case, and their theory of impeachment there just shows you how thin their theory of impeachment is. Because the expert said that he reviewed the science of somebody, and then they said, well, did you know that he wrote some reports in different cases that you haven't looked at, and they were criticized in this book? And the witness says, no, I've never seen that book. I don't know what you're talking about. And then the other side reads page after page from that book. So please do look at that, and I think you'll get a character for how far off the rails all of this went. One last point on the evidentiary points. Mr. Lanier referred to the fact that in subsequent cases that we have not gone down this road. It's outside the record. But just to be clear, the reason that that hasn't happened in subsequent cases is we've basically been told by the district court judge that we can't say anything about us being a decent company, or if we do, we're going to open the door to all this nonsense again. So the only reason that this hasn't happened in subsequent cases is because the interorum effect of this ruling and this idea that by saying, you know, we're decent people, we make decent products, all of a sudden that opens us up to race discrimination in Saddam Hussein. So moving on to some of the more legal points, on J&J and personal jurisdiction, my friend, Mr. Starr, refers you to what he thinks is his best evidence, which is Plaintiff's Exhibit 521, where a J&J patent lawyer clears a product for distribution. That's not in the evidentiary record. It didn't go before the jury. And we objected, actually, on attorney-client privilege grounds, and that was never definitively resolved. So it was never admitted into evidence. And that's the best piece of evidence they have for J&J. There is no evidence that these doctors looked at the website and got the idea to install these products from the website. There is no minimum contact link between J&J and the claims in this case. On the IFU, Mr. Lanier is absolutely right. There are two IFUs in this case. They both talk about metal debris. Excerpts of Record 20, the IFU, I'm holding it in my hand. It talks about both implanted metal alloys released, metallic ions in the body, and the potential for release of metallic debris into the joint space. It may be nitpicking, but didn't that only relate to the metal released from the porous exterior? It may be nitpicking, and I suppose if they had an expert that made that point about the IFU, we could nitpick back. But that's not the nature of their criticism, and I just heard it emphatically stated that the IFU for the liner didn't talk about metal debris, and it does. So I just want to make that clear for the record. I have nothing further in this appeal, Your Honor.  Thank you.